UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                       :

SUE DOWNES,                          :

                    :

              Plaintiff,       :

                    :       03 Civ. 8991 (GEL)

          -v.-              :

                    :       **OPINION AND ORDER**

J.P. MORGAN CHASE & CO., et al.,    :

                    :

            Defendants.    :
-------------------------------------------------------------x

Shira Y. Rosenfeld and Charles B. Manuel, Jr.,
Manuel & Rosenfeld, LLP, New York, NY, for
plaintiff.

Mark G. Cunha, Elaine M. Divelbliss, and Vincent
R. FitzPatrick III, Simpson Thacher & Bartlett LLP,
New York, NY, for defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff Sue Downes, a purported former employee of defendant JP Morgan Chase &

Co. ("Chase"), brought this action alleging improper denial of certain employee benefits under

ERISA, violation of the Equal Pay Act ("EPA" or "Act"), and various causes of action under

state law.  On May 8, 2006, this Court adopted the thorough and closely-reasoned Report and

Recommendation ("R&R") of the Honorable Michael H. Dolinger, United States Magistrate

Judge, granting summary judgment for Chase on all of plaintiff's claims except her Equal Pay

Act claim.  Downes v. JP Morgan Chase & Co., No. 03 Civ. 8991, 2006 WL 1233939 (S.D.N.Y.

May 8, 2006), adopting R&R, 2006 WL 785278 (S.D.N.Y. March 21, 2006).

      In denying Chase's motion for summary judgment on the EPA claim, the Court agreed

with the Magistrate Judge that "whether defendants ultimately were aware of and had control of

the wages of Downes and her alleged male comparators, whether those comparators were similarly-situated to Downes, whether their work was substantially equal to hers, and whether Downes and the comparators were employees of Chase, are quintessential fact questions" requiring trial.  2006 WL 1233939 at *2.  The Court noted, however, that in its objections to the R&R, Chase had argued for the first time that Downes was not covered by the EPA at all, because she was a computer professional exempted by 29 U.S.C. § 213(a)(17) from coverage under the Act.  Since this argument had not been previously presented by defendants or considered by the Magistrate Judge, the Court found it no obstacle to adopting the Magistrate Judge's recommendations on the issues that had been so presented and considered, and deferred further consideration of the argument.  Id.

At a subsequent conference, the Court authorized supplemental briefing on the exemption issue, which has now been completed.  Having fully considered the questions raised by that briefing, the Court concludes that Chase is correct that computer professionals as defined in § 213(a)(17) are outside the protection of the EPA.  However, because the record leaves genuine issues of material fact with respect to whether Downes falls within that definition, defendants' motion for summary judgment will be denied.

## BACKGROUND

The factual contentions of the parties and the legal standards relevant to Downes's various claims are fully set forth in the prior opinions of the Court and will not be repeated here.[1]

---

[1] For the full background to the case, see Downes, 2006 WL 1233939 (adopting R&R and granting summary judgment on all of plaintiff's non-EPA claims); 2006 WL 785278 (R&R addressing defendants' motion for summary judgment); and 2004 WL 1277991 (S.D.N.Y., June 8, 2004) (resolving motion to dismiss and applying statute of limitations to bar a period of plaintiff's EPA claim).

For present purposes it is enough to note that plaintiff Downes undisputedly worked as a "technology manager and leader of the Hardware Standards Group within [Chase's] Enterprise Technology Services Group" (Downes July 2006 Aff. ¶ 9), during the period relevant to her claims.  Additional background regarding her work duties will be described later in this opinion.  Downes was terminated in May 2003 and later that same year commenced this lawsuit.  Chase contends that Downes is a computer professional exempt from the EPA; Downes opposes that contention on procedural and substantive grounds, arguing that allowance of the undisputedly belated defense would unduly prejudice her, that the computer professional exemption does not apply to the EPA at all, and that, even if it does, triable issues of fact remain as to whether she falls within that exemption.

**DISCUSSION**

I.    <u>Waiver</u>

In raising its claim of exemption, Chase effectively seeks leave to amend its answer pursuant to Fed. R. Civ. P. 15(a) to include the defense that plaintiff is exempted from coverage by the relevant statutory provision.  See <u>Magana v. Comm. of the Northern Mariana Islands</u>, 107 F.3d 1436, 1445-46 (9th Cir. 1997) (claim of Fair Labor Standards Act exemption is an affirmative defense that must be specifically pleaded under Fed. R. Civ. P. 8(c) or be considered waived).  Downes argues that Chase should be denied leave and instead be deemed to have waived the exemption defense, because otherwise she will "suffer prejudice."  (P. Supp. Mem. at 21.)  While undue prejudice is a reason to deny leave to amend an answer, Downes has not met her burden of demonstrating the risk of such prejudice here.

Leave to amend a pleading "shall be freely given when justice so requires."  Fed. R. Civ.

P. 15(a).  This mandate of the Federal Rules of Civil Procedure has been interpreted as

"reject[ing] the approach that pleading is a game of skill in which one misstep by counsel may be

decisive to the outcome and accept[ing] the principle that the purpose of pleading is to facilitate

a proper decision on the merits."  Foman v. Davis, 371 U.S. 178, 181-82 (1962).  The decision

whether to permit amendment lies within the discretion of the district court, but refusal "without

any justifying reason" constitutes an abuse of that discretion.  Id. at 182.  In the Second Circuit,

reason to refuse is found in "a showing by the nonmovant of prejudice or bad faith," in the

absence of which amendment should be permitted.  Block v. First Blood Associates, 988 F. 2d

344, 350 (2d Cir. 1993).  As relevant here, prejudice may be found in circumstances that "require

the opponent to expend significant additional resources to conduct discovery and prepare for trial

[or] significantly delay the resolution of the dispute."  Id.

Downes concedes that she "cannot establish bad faith" (P. Supp. Mem. 21), but insists

that Chase's delay has caused her prejudice.  She claims that "the record is totally devoid of any

discovery concerning" her statutory coverage and – although this argument is not explicitly

made – that she would be driven to added expense in taking further discovery, assuming it were

permitted.  (Id. at 21-22.)  "Even if plaintiff was allowed this discovery at this late juncture,"

Downes complains, "it would certainly delay the resolution of this case . . . , and it would be

largely futile because [Chase's] witnesses would be fully programmed to respond."  (Id. at 22.)[2]

------

[2] Downes's argument that, because the exemption defense was not earlier raised, she has
somehow missed the opportunity to trap Chase into "party admissions that would likely have
sealed these issues for plaintiff" (P. Supp. Mem. at 22), is completely unpersuasive.  The Court
will not assume that, if further discovery were required, Chase's witnesses would be
"programmed" to provide false testimony tailored to its exemption defense.  Moreover, if the

These arguments are unavailing.  The record is hardly devoid of discovery concerning plaintiff's coverage.  As will be discussed below with respect to the merits of the exemption argument, the relevant question of coverage amounts to a question about the duties plaintiff performed at work.  See 29 U.S.C. § 213(a)(17); 29 C.F.R. § 541.103 (2003).  Downes requires no discovery to describe her own work history.  Indeed, the record is replete with relevant factual submissions, including four affidavits of plaintiff, her deposition testimony, and numerous supporting documents.  To the extent that submissions predating defendants' raising of the exemption argument may have been incomplete, plaintiff has had the opportunity, and exercised it, to submit a further affidavit.  (See Downes July 2006 Aff.)  Moreover, Chase's argument relies entirely on Downes's own deposition testimony, and is not based on any evidentiary submissions of its own that Downes could test by further discovery.  Downes thus provides no persuasive reason to think that more discovery is required.

Further, the delay resulting from allowance of this additional defense is hardly remarkable, let alone "significant[]."  Block, 988 F.2d at 350.  While Chase certainly could and should have raised its exemption defense earlier, briefing on the issue was ordered shortly after the initial summary judgment motion was resolved, which motion plaintiff sensibly does not claim caused any undue delay.  The Court's opinion adopting the R&R to resolve that first summary judgment motion provided plaintiff ample notice, in the interim before briefing was ordered, that the exemption issue was in play.  An extension of the exemption-defense briefing schedule was granted on a joint request submitted by plaintiff's counsel, and the issue was fully

---

Court were to indulge this assumption, it would equally have to assume that the same programming would have occurred had the defense been presented in Chase's initial answer.

briefed as of August 11, 2006.  The few months' delay in resolution of this case that can fairly be

attributed to defendants' tardiness is hardly unusual, even if undesirable, and by itself is no

reason to disallow the exemption defense.

Finally, a finding of waiver would be particularly inappropriate here.  Chase does not

seek belatedly to assert a technical, non-merits defense such as the statute of limitations.  Rather,

it argues that the law on which plaintiff relies simply does not apply to her.  In effect, plaintiff's

waiver argument amounts to the claim that, even if no law prohibits defendants' conduct or

provides her the remedy she seeks, she should be awarded damages because the defendants did

not notice sooner that their conduct was entirely legal.  A rule that permits amendment whenever

"justice so requires" would be bent beyond recognition by such a result.

II.    Exemption from Equal Pay Coverage

Chase argues that Downes may not pursue claims under the Equal Pay Act, which is

codified within the minimum wage section of the Fair Labor Standards Act ("FLSA"),[3] because

the record indisputably shows her to fall within a category of employees, certain skilled

---

[3] The equal pay provision of the FLSA, 29 U.S.C. § 206(d), reads, in pertinent part:

> Prohibition of sex discrimination – (1) No employer having
> employees subject to any provisions of this section shall
> discriminate, within any establishment in which such employees
> are employed, between employees on the basis of sex by paying
> wages to employees in such establishment at a rate less than the
> rate at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance of
> which requires equal skill, effort, and responsibility, and which are
> performed under similar working conditions, except where such
> payment is made pursuant to (i) a seniority system; (ii) a merit
> system; (iii) a system which measures earnings by quantity or
> quality of production; or (iv) a differential based on any other
> factor other than sex.

computer workers, specifically excluded from FLSA coverage.  See 29 U.S.C. § 213(a)(17).
Downes counters, first, that, even if she clearly falls within that category, her claim must still
survive, because to read the FLSA as excluding skilled computer workers from equal pay
coverage would contravene the very purpose of the EPA.  Alternatively, she argues that the
existing record does not establish her classification within that exemption category beyond a
triable dispute.[4]  The Court declines plaintiff's invitation to interpret the FLSA contrary to its
plain meaning, but concludes that genuine issues of material fact exist as to whether Downes's
"primary duty" falls within the skilled computer worker exemption.

---

[4] Downes further argues that her work duties actually place her within a different FLSA
exemption category, one that encompasses executive, administrative, and professional
employees.  See 29 U.S.C. § 213(a)(1).  This category, like others within 29 U.S.C. § 213(a), is
excluded from the FLSA's minimum wage protections; unlike the others, however, it is
specifically *not* excepted from coverage by the equal pay provision.  Downes argues that,
whether or not she is determined to be an EPA-excluded skilled computer worker, her
classification as an EPA-*included* managerial worker enables her to maintain her equal pay
claims.

   This argument misconstrues the structure of the relevant statutes.  Contrary to Downes's
suggestion, there is nothing "far-fetched" about the "proposition that in an EPA action, an
employee covered under Section 213(a)(1) loses protection under the EPA if that employee also
falls within the definition of [skilled computer workers in § 213(a)(17)]."  (P. Supp. R. Mem. 2.)
The FLSA exemptions are separate and independent, albeit occasionally overlapping.  As is clear
from the discussion of the legislative history below, in making the FLSA exemption for
executive, administrative and professional employees inapplicable to the EPA, Congress did not
affirmatively mandate gender-equal pay for all employees within that exemption, regardless of
whether they fell within any other exemption.  Rather, it simply removed employers' ability to
rely on that particular exemption in contesting an EPA case.  In the present case, the burden is on
Chase to establish that Downes falls within an exclusion from EPA coverage.  Chase does not,
and cannot, rely on the § 213(a)(1) exemption for executives, administrators and professionals,
which no longer applies to the EPA.  It relies instead on the entirely separate § 213(a)(17)
exemption for certain skilled computer workers.  Whether or not Downes would be categorized
within one FLSA exception (which does not apply to the EPA) is irrelevant to whether she is
categorized within another (which does).

A.    <u>Equal Pay Exemption under § 213(a)(17)</u>

The EPA constitutes a subsection of FLSA's minimum wage section, 29 U.S.C. § 206. The disputed exemption states that "[t]he provisions of section 206 . . . shall not apply with respect to . . . any employee" whose primary duty is to perform certain computer-related work for a certain level of pay.  29 U.S.C. § 213(a)(17).  Downes does not, as she reasonably could not, suggest that the statutory text denying equal pay coverage to workers categorized within § 213(a)(17) is at all ambiguous; computer workers falling within the category defined in § 213(a)(17) are by the express terms of the statute not covered by *any* of the provisions of § 206, including the EPA.  Rather, she argues that any such denial "simply flies in the face of the remedial, equitable and humanitarian purposes of the [EPA]."  (P. Supp. Mem. 11.)   She urges that Congress, given the history of the EPA's passage, could not have intended by § 213(a)(17) – or any occupation-based exemption category, by her logic – to exclude the encompassed employees from equal pay protection: "There is no basis for any exemption of EPA coverage based on [Downes's] profession, since the EPA was clearly enacted to remedy wage differentials between men and women that have no legitimate explanation other than sex discrimination." (<u>Id</u>.)  Plaintiff's argument may well be persuasive as a matter of policy or moral imperative. Nevertheless, the actual history of the relevant legislation depicts a legislative reality that falls short of her proposed ideal.

Congress passed the EPA "[t]o prohibit discrimination on account of sex in the payment of wages."  Equal Pay Act of 1963, Pub. L. No. 88-38, 77 Stat. 56, Preamble.  It found among other problems that "wage differentials based on sex" depressed wages and living standards for workers, caused labor strife, and enabled unfair competition among employers.  <u>Id</u>., Declaration

of Purpose, § 2(a); see also Corning Glass Works v. Brennan, 417 U.S. 188, 206 (1974).  During

debate preceding passage, legislators discussed gender discrimination in pay as not merely a

pragmatic but also a moral issue: "[T]he bill pending . . . is an act of economic justice which

would advance our civilization by translating into action another aspect of our national ideals

concerning equal rights and equal opportunities for women," noted one senator.  109 Cong. Rec.

8913, 8915 (1963) (statement of Sen. Randolph), reprinted in Comm. on Educ. and Labor, 88th

Cong., Legislative History of the Equal Pay Act of 1963, at 53 (1963) (as prepared by the Office

of Solicitor of the U.S. Department of Labor).  Rep. Adam Clayton Powell, Jr., chair of the

House committee that championed enactment of the EPA, declared, "The fact that employers

still pay lower wage rates to women workers for the same or comparable work as that performed

by men workers in the same place is contrary to every concept of equality and justice in which

we so strongly believe."  109 Cong. Rec. 9192, 9195 (1963) (statement of Rep. Powell),

reprinted in Legislative History of the EPA at 56.  To address these concerns, Congress adopted

a solution "simple in principle: to require that 'equal work will be rewarded by equal wages.'"

Corning Glass Works, 417 U.S. at 195 (quoting S. Rep. No. 88-176, at 1 (1963)).

Yet, as the Supreme Court noted in its single case considering the history of the EPA,

"the concept of equal pay for equal work was more readily stated in principle than reduced to

statutory language which would be meaningful to employers and workable across the broad

range of industries covered by the Act."  Id. at 198-99.  Indeed, attempts to advance a national

equal-pay requirement had stalled for some 18 years, until one legislator in March 1963

introduced a bill that, "for the first time, placed the administration and enforcement of equal pay

legislation under the [FLSA].  This concept was the catalyst that had been needed," leading

"[v]ery quickly" to approval of a single equal pay proposal by both houses.  109 Cong. Rec. at

9192, 9195 (1963) (statement of Rep. Frelinghuysen), reprinted in Legislative History of the

EPA at 57-58.  Congress concluded that, "[b]ecause of the long history and experience of

Government and business and workers with the [FLSA], a simple expansion of that act to

include the equal pay concept offers the most efficient and least difficult course of action," as

such expansion "eliminates the need for a new bureaucratic structure to enforce equal pay

legislation; and second, compliance should be made easier because both industry and labor have

a long-established familiarity with existing fair labor standards provisions."  H.R. Rep. No. 88-

309, at 2 (1963); see also S. Rep. No. 88-176, at 2-3 (1963).

　　　　Two Courts of Appeals considering this legislative history have stressed that the EPA

was enacted as an amendment to the FLSA "only for administrative convenience and economy,"

and they have distinguished the EPA's "anti-discrimination" purpose from the commerce-

regulation purpose of the preexisting FLSA, enacted some 25 years earlier.  Usery v. Charleston

County School Dist. of Charleston County, South Carolina, 558 F.2d 1169, 1171 (4th Cir. 1977)

(holding the equal pay provision of the FLSA to be severable, because of its different basis, to

overcome a state sovereign immunity challenge); see also Marshall v. City of Sheboygan, 577

F.2d 1, 4-5 (7th Cir. 1978).[5]  Despite this different purpose, however, Congress consciously

---

　　　　[5] In passing the FLSA, Congress had found "that the existence, in industries engaged in
commerce or in the production of goods for commerce, of labor conditions detrimental to the
maintenance of the minimum standard of living necessary for health, efficiency, and general
well-being of workers (1) causes commerce and the channels and instrumentalities of commerce
to be used to spread and perpetuate such labor conditions among the workers of the several
States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair
method of competition in commerce; (4) leads to labor disputes burdening and obstructing
commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair
marketing of goods in commerce."  29 U.S.C. § 202.  Congress further provided that "[i]t is

accepted certain implications of grafting the EPA onto the FLSA, including, as relevant here, the adoption of the FLSA's categorical exceptions from coverage.

As originally enacted in 1938, the FLSA had excluded from its protections certain categories of workers, generally according to industry or function.  See Fair Labor Standards Act of 1938, Pub. L. 109-279, ch. 767, § 13, 52 Stat. 1060 (codified as amended at 29 U.S.C. § 213). The legislative record of the EPA shows that members of Congress recognized and embraced the coverage exemptions that would result from inserting the EPA into the FLSA's minimum wage section.  As one representative stated during the congressional debate:

> For those who fear this legislation . . . I would like to point out that all women are by no means covered in this act . . . . All of the fair labor standards exemptions apply; and, this is very noteworthy, agriculture, hotels, motels, restaurants, and laundries are excluded. Also all professional, managerial, and administrative personnel . . . are excluded.  So, a very great quantity of women will not be covered in this act.

109 Cong. Rec. 9192, 9193 (1963) (statement of Rep. St. George), reprinted in Legislative History of the EPA at 76; see also id. at 9196 (statement of Rep. Thompson), reprinted in Legislative History of the EPA at 77 ("[P]erhaps the most worthy result [of enactment under the FLSA] . . . is in the question of coverage.  The bill neither extends nor curtails coverage under the act . . . . [M]any women who are employed are not to be covered.").  The extension of the FLSA coverage exemptions to the proposed EPA was noted not just for its administrative virtues, but also for its restrictive effect: "These exempt industries are ones in which there are

---

declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."  Id.

heavy concentrations of women employees and ones in which wages are generally low.  These

are the women that require the greatest protection and it is disappointing that they are not being

afforded the protection they deserve."  109 Cong. Rec. 9192, 9202 (1963) (statement of Rep.

Kelly), reprinted in Legislative History of the EPA at 79.

The legislative history of the EPA thus confirms that the literal language bringing it

within the FLSA exemptions was intentional, and not a mere slip of the drafter's pen.

Proponents of the bill highlighted the limitations on coverage that resulted from application of

the FLSA exemptions in soliciting the votes of those less enthusiastic about its adoption, even as

some of them regretted the resulting limited reach.  Like many legislative enactments, the EPA

represented not an ideal embodiment of the egalitarian purposes proclaimed in its preamble, but

a compromise among legislative forces with varying degrees of commitment to those purposes

and other opposing concerns.

Recognition of the restrictive effect of enacting the EPA as an amendment to the FLSA

led Congress to revisit one category of EPA exemption in the early 1970s.  As part of the

omnibus Education Amendments of 1972, which sweepingly addressed education-related issues

from funding for university facilities to student loans to establishment of the National Institute of

Education, Congress declared that "Section 13(a) of the [FLSA – that is, 29 U.S.C. § 213(a)] is

amended by inserting after the words 'the provisions of section 6' the following: '(except section

6(d) in the case of paragraph (1) of this subsection)'."  Pub. Law 92-318, 86 Stat. 235, 375.  The

effect of this somewhat convoluted language was to modify the opening words of § 213(a),

which had previously stated that the list of exemptions within that subsection applied to all of the

provisions of the minimum wage provisions of the FLSA, § 206, including the EPA, to provide

that *one* of those many exemptions – the first, applying to executives, administrators and professionals – would no longer apply to the EPA.

Congress "eliminat[ed] the present exemption of individuals employed in executive, administrative, or professional positions from the equal pay for equal work provisions . . . [because] [t]estimony . . . revealed that women in these positions are too often paid less than their male colleagues because of the existing exemption." H. R. Rep. 92-554 (1971), reprinted in 1972 U.S.C.C.A.N. 2462, 2512. That testimony, offered over the course of seven days by witnesses from the National Organization for Women, the U.S. Civil Rights Commission, and universities including Columbia, New York University, and Harvard, along with numerous other speakers and statements, had largely focused on exposing gender-correlated rank and salary differences among white-collar employees in higher education. See Discrimination Against Women, Parts I & II: Hearings on § 805 of H.R. 16098 Before the Special Subcomm. on Educ. of the H. Comm. on Educ. and Labor, 91st Cong. (1970); see also McCormick v. Schl. Dist. of Mamaroneck, 370 F.3d 275, 286 (2d Cir. 2004). The exemption-from-exemption amendment, however, does not expressly address higher education employees or any particular industry, but rather applies to all executives, administrators and professionals as defined in the FLSA exemption. See 29 U.S.C. § 213(a)(1).

As applied to someone like Downes, the effect of the law would have been significant. By her own argument that she should be classified as an executive or administrator, Downes in effect acknowledges that she would not have been covered by the EPA at the time of its enactment in 1963, because she would have fallen within a recognized FLSA exemption. Since it has not been suggested that any other exemption extant in that era would have applied to her,

however, she would have come under the EPA's coverage in 1972, when the relevant exemption

was made inapplicable to the EPA.

The rules changed again, however, in the 1990s.  At that time, a particular industry,

computer work, drew Congress's attention, this time for inclusion among the broader exemptions

from FLSA coverage.  Nothing in the legislative history suggests that Congress targeted

computer workers for exclusion specifically from the EPA.  Although the legislative record is

extremely sparse, it appears that Congress was attempting to apply longstanding labor standards

to an emerging field of relatively high-paying, in-demand work.  In 1990, it passed a measure

directing the Secretary of Labor to promulgate regulations permitting certain computer workers

"to qualify as exempt executive, administrative, or professional employees under section

13(a)(1) of the [FLSA].  Such regulations shall provide that if such employees are paid on an

hourly basis they shall be exempt only if their hourly rate of pay is at least 6 1/2 times greater

than the applicable minimum wage rate under section 6 of such Act."[6]  Regulations Concerning

Certain Employees, Pub. L. 101-583, 104 Stat. 2871.  The Department of Labor responded by

adjusting its regulations defining the status of "professional" within 29 U.S.C. § 213(a)(1).  See

Whittaker, CRS-8-9.  The resulting regulations exempted the defined category of computer

workers from the minimum wage and maximum hours provisions of the FLSA, but because they

did so by defining such workers as executives, administrators or professionals under § 213(a)(1)

– the one FLSA-exempt category *not* exempted from the EPA – they had no effect on the

---

[6] Congress conducted no hearings on the measure and passed it with relatively little
discussion.  See William G. Whittaker, Computer Services Personnel: Overtime Pay Under the
Fair Labor Standards Act, Cong. Research Serv., Order Code RL30537, at CRS-3 (updated Jan.
6, 2003).

continued coverage of skilled computer workers by the equal pay provision.

Apparently dissatisfied with this solution, Congress acted more directly in 1996, as part of the omnibus Small Business Job Protection Act of 1996, Pub. L. 104-188, 110 Stat. 1755, which created the statutory categorical exemption of § 213(a)(17).  Although the minimum wage requirement, generally, was much discussed prior to passage of the omnibus law, computer workers specifically were hardly addressed.  When the proposed computer work exemption was addressed, discussion focused solely on the FLSA's minimum wage rates and maximum hour provisions, and made no reference to the merits of excluding such workers from the protections of the EPA.  See H.R. Rep. No. 104-737 (1996) (Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 1677; S. Rep. 104-281 (1996), reprinted in 1996 U.S.C.C.A.N. 1474; 142 Cong. Rec. H5504-H5544 (daily ed. May 23, 1996).  During discussion of computer-worker coverage, the issue of gender equality in pay appears not to have come up at all.[7]  Nevertheless, by grouping computer workers in their own, separate exclusion from FLSA coverage, and removing them from the exemption under § 213(a)(1) that was no longer excluded from the reach of the EPA, the language chosen by Congress, as noted above, had the clear, express effect of excluding the defined category of computer workers from *all* provisions of § 206, including the EPA.

------

[7] In addition to exempting certain computer workers from FLSA coverage, explicitly, "the exemption in Section 213(a)(17) broadened the coverage of computer services personnel from that included in the prior Section 213(a)(1) computer professional exemption and the 1991 [Department of Labor] regulations in three significant ways," Bobadilla v. MDRC, No. 03 Civ. 9217 (JGK), 2005 WL 2044938, at *6, n.5 (S.D.N.Y. Aug. 24, 2005)– eliminating (1) the regulations' limitation of the exemption to "highly-skilled employees who have achieved a level of proficiency in the theoretical and practical application of a body of highly specialized knowledge," 29 C.F.R. § 541.303(c), (2) any specific educational requirements, and (3) a requirement that the employee's work involved the exercise of independent judgment and discretion.  Bobadilla, supra, citing Whittaker at CRS-9-10.

Although there is no indication in the legislative history that Congress passed the 1996 computer-workers exemption specifically to exclude such employees from EPA coverage – rather than simply to exempt them from the more intuitively relevant overtime provisions – neither is there anything expressly suggesting that it did *not* intend that effect.  It is well established that the plain language of a statute should be presumed to express congressional intent, except in "rare and exceptional circumstances . . . when a contrary legislative intent is clearly expressed."  Ardestani v. Immigration and Naturalization Service, 502 U.S. 129, 129 (1991) (internal quotation marks and citations omitted); see also Lewis v. Grinker, 965 F.2d 1206, 1221-1222 (2d Cir. 1992).  Where the statutory text is clear, a challenger bears an "exceptionally heavy" burden of persuading a court that Congress harbored "a manifest intent contrary to the [statute's] actual language."  Lewis, 965 at 1222, citing Union Bank v. Wolas, 502 U.S. 151, 156 (1991).  A "scant history on th[e] precise issue does not suggest a clearly expressed legislative inten[t] . . . contrary . . . to the plain language of" a statute.  Toibb v. Radloff, 501 U.S. 157, 162 (1991) (internal quotation marks and citation omitted) (second brackets in original).

Plaintiff here does not, as she reasonably could not, dispute the plain language of 29 U.S.C. §213(a)(17).  She points to no evidence whatsoever of a legislative intent contrary to the clear text of the statute, nor has the Court discovered any.  Indeed, although it appears that the principal point of the 1996 computer-related exemption amendment was not to exclude encompassed workers from EPA coverage, that effect, in light of the history of EPA exemptions discussed above, can only be said to have been apparent to Congress.  Even if many would argue that the result is not just or in keeping with the ideal purposes of the EPA, Congress deliberately

passed the EPA in the first place in a manner that it knew would automatically exclude large categories of workers.  It did so while perfectly cognizant of the purpose, gender equality in pay, that distinguished the EPA from the preexisting FLSA.  The decision to restrict the reach of the EPA at that time was entirely conscious, and apparently the product of a need for compromise to secure passage of the Act itself.  When it revisited the issue of EPA exclusions in 1972, Congress eliminated only one categorical exclusion, leaving the others untouched.  The limited, selective quality of this change was not subtle or hidden, but rather was expressed in clearly limiting text at the outset of the relevant exemption section.  Thus, by the time it passed the computer-workers exemption in 1996, Congress had proved capable of excluding numerous categories of workers from EPA coverage via § 213(a) and had also proved capable of crafting language selectively to avoid such exclusion.  Even though there was no expressed rationale for excluding computer workers from EPA coverage – and even if an outside observer might suspect that many or all of the members of Congress who voted for the exemption in 1996 were not subjectively aware of this particular effect of their chosen strategy – in the context of the historical evolution of the EPA, and in the absence of any indication in Congress of a belief that the exemption would *not* apply to the EPA, the clear language of §213(a)(17) cannot be deemed to contradict a clearly-expressed congressional intent.

Whether this effect is justified is a question not for this Court, but rather for Congress and ultimately for the American people.  Although it does not help her case for statutory construction, plaintiff's point, that the right to gender equality should not vary by profession, would seem an important message for advocacy groups and political leaders to take to the nation's legislature.  The EPA was born of popular pressures to achieve a more just and

equitable society for women.  Still, in 1963, adopting preexisting categorical exclusions may have seemed a convenient way to contain the then-radical impact of gender-equality legislation. Since the EPA's passage, however, popular understandings about the equality of women and men have advanced, as evident from such major events as the enactment of Title VII, the evolution of constitutional gender-equality jurisprudence, and the proliferation of women in the workforce.[8]  To the extent that Congress's addition of the §213(a)(17) EPA exclusion in 1996 may seem to diverge from the path of social progress, and to do so without any evident zeal or even express rationale, it would seem worthwhile for concerned men and women to ask their representatives to reconsider.  It is not for a court of law, however, to amend the statute, even in a socially desirable way, in the guise of interpretation.

      B.     Downes's Exemption Under § 213(a)(17)

As § 213(a)(17) does operate as an exclusion from EPA coverage, it is necessary to decide whether defendants have established beyond a triable dispute that Downes should be classified within that exemption category and that they should therefore be granted summary judgment.

      1.     Legal Standards

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no

---

[8] See 42 U.S.C. §§ 2000e-2-2000e-3; see also, e.g., Reed v. Reed, 404 U.S. 71 (1971); Frontiero v. Richardson, 411 U.S. 677 (1973); Weinberger v. Wiesenfeld, 420 U.S. 646 (1975); Stanton v. Stanton, 421 U.S. 7 (1975); Craig v. Boren, 429 U.S. 190 (1976); Califano v. Goldfarb, 430 U.S. 199 (1977); Califano v. Westcott, 443 U.S. 76 (1979); Orr v. Orr, 440 U.S. 268 (1979); Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142 (1980); Kirchberg v. Feenstra, 450 U.S. 455 (1981); U.S. v. Virginia, 518 U.S. 515 (1996).

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001).  The moving party bears the burden of establishing the absence of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  In deciding a summary judgment motion, the court must "resolve all ambiguities and draw all reasonable references in the light most favorable to the party opposing the motion." Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

Besides its summary judgment burden, Chase bears the ultimate burden of proving that Downes falls within a defined FLSA exemption.  See Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206 (1966); Adams v. Dep't of Juvenile Justice of City of New York, 143 F.3d 61, 65 (2d Cir. 1998) (citation omitted); Freeman v. National Broadcasting Co., Inc., 80 F.3d 78, 82 (2d Cir. 1996) (citations omitted).  Such exemptions, given the remedial purpose of the FLSA, will be narrowly construed.  See Corning Glass Works v. Brennan, 417 U.S. 188, 208 (1974) ("[the EPA] is broadly remedial, and . . . should be construed and applied so as to fulfill the underlying purposes which Congress sought to achieve."); see also Phillips v. Walling, 324 U.S. 490, 493 (1945) (for principle that exemptions to remedial legislation, in that case the pre-EPA version of the FLSA, should be narrowly construed); see also Adams, 143 F.3d at 65.

The disputed exemption provision for certain skilled computer workers requires that:

> The provisions of section 206 [which contains the equal pay protection] . . . shall not apply with respect to – any employee who is a computer systems analyst, computer programmer, software engineer, or other similarly skilled worker, whose primary duty is – (A) the application of systems analysis techniques and procedures, including consulting with users, to determine hardware, software,

19

or system functional specifications;
(B) the design, development, documentation, analysis, creation,
testing, or modification of computer systems or programs,
including prototypes, based on and related to user or system design
specifications;
(C) the design, documentation, testing, creation, or modification of
computer programs related to machine operating systems; or
(D) a combination of duties described in subparagraphs (A), (B),
and (C) the performance of which requires the same level of skills,
and who, in the case of an employee who is compensated on an
hourly basis, is compensated at a rate of not less than $27.63 an
hour.

29 U.S.C. § 213(a)(17).  Thus, to establish that a claimant is to be excluded from FLSA coverage

under § 213(a)(17), a defendant must prove that the claimant meets certain pay and "primary

duty" criteria.  Here, there is no disagreement that Downes meets the pay requirement, as she

was an employee who was compensated at a rate of "not less than $27.63 an hour."  29 U.S.C. §

213(a)(17).  Rather, the parties dispute whether Downes's "primary duty" consisted of the acts

described in the provision.  Id.

The issue of an employee's exemption from FLSA coverage based on duties performed

presents a mixed question of law and fact.  Whether a duty falls within the definition of the given

exemption is a question of law, but whether and to what extent a worker performed that duty

constitutes an issue of fact.  Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986).  The

ultimate question of a particular worker's exemption, based on factual findings as to her actual

work activities, requires a conclusion of law.  Freeman v. National Broadcasting Co., Inc., 80

F.3d 78, 82 (2d Cir. 1996) (citations omitted).  The federal regulations in effect during the period

of alleged violation defined "primary duty," as relevant to the computer-worker exemption, by

referencing the concept as used to determine exemptions from minimum wage and overtime

20

coverage for executive or administrative employees.  See 29 C.F.R. § 541.304 (2003).[9]  For

purported executives, the primary duty analysis was to be "based on all the facts in a particular

case."  29 C.F.R. § 541.103 (2003).  That regulation further provided:

> The amount of time spent in the performance of the [described]
> duties is a useful guide in determining . . . the primary duty . . . . In
> the ordinary case it may be taken as a good rule of thumb that
> primary duty means the major part, or over 50 percent, of the
> employee's time . . . .  Time alone, however, is not the sole test
> . . . .  [Other] pertinent factors are the relative importance of the
> [described] duties as compared with other types of duties, the
> frequency with which the employee [performs the described
> duties], . . . and the relationship between [the employee's] salary
> and the wages paid other employees for the kind of nonexempt
> work performed by [the employee].  For example, . . . . [i]n the
> data processing field an employee who directs the day-to-day
> activities of a single group of programmers and who performs the
> more complex or responsible jobs in programing will be
> considered to have management as his primary duty.

Id.  Regarding the primary duty analysis for possible administrative employees, the regulation

merely indicated that "the principles explained in § 541.103 in the discussion of 'primary duty'

under the definition of 'executive' are applicable."  29 C.F.R. § 541.206 (2003).

---

[9] Congress has never defined numerous terms, such as "primary duty," used in the FLSA
exemption provisions.  With respect to §213(a)(1), Congress has directed the Secretary of Labor
to define such terms through notice-and-comment rulemaking, and the regulations so issued
carry the force of law and warrant deference unless arbitrary, capricious, or manifestly contrary
to the purpose of the statute.  Freeman, 80 F.3d at 82; see also Chevron v. Natural Resources
Defense Council, Inc., 467 U.S. 837, 843-44 (1984).  The Department of Labor itself has
acknowledged some ambiguity as to its rule-making authority with respect to § 213(a)(17), as
the statutory text, in contrast to that of § 213(a)(1), does not specifically provide for such a
function.  See Defining and Delimiting the Exemptions for Executive, Administrative,
Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22159 ("Supplementary
Information: Subpart E, Computer Employees").  However, as no party suggests it would be
erroneous to do so, this Court takes the agency regulations regarding interpretation of the
exemptions generally as instructive authority in this case.

2.   Analysis

There is more than a little irony in Downes's contention that she is not a computer professional within the meaning of the subject exemption.[10]  On Chase's original motion for summary judgment, plaintiff's main response regarding the equal pay issue was to emphasize the advanced nature of her computer-related duties, in an effort to demonstrate that she performed work equal to that of her proposed male comparators, Laurencelle and Nangia, both of whom would appear to be highly-skilled computer engineers.  (See P. Opp. to S.J. at 28-29.)

---

[10] Plaintiff sensibly does not dispute that she was at least a "computer systems analyst . . . or other similarly skilled worker," 29 U.S.C. § 213(a)(17), but rather disputes that her primary duty fell within that provision's task-related definitions.  (See P. Supp. Mem. at 8.)  Indeed, the record suggests no factual issue as to Downes's relevant skill level.  Plaintiff's own testimony emphasizes her expertise in a variety of computer-related tasks.  (See, e.g., Downes July 2006 Aff. ¶¶ 9, 12; Downes Dep. at 139; 157-59.)  Her resume describes her as a "Technical Specialist" for Chase, references her experience as a "Network Analyst," and devotes the better part of a page to listing her experience with the "[i]mplementation and development" of various computer systems and her experience with a variety of hardware and software products (Downes July 2006 Aff., Ex. 4), such that a factfinder could readily conclude that she has a high level of computer expertise.  During the relevant time, the U.S. Department of Labor described a "computer systems analyst" rather broadly as one who, among other functions, "[a]nalyze[s] user requirements, procedures, and problems to automate or improve existing systems and review computer system capabilities, workflow, and scheduling limitations."  See Occupational Information Network ("O*NET"), www.onetcenter.org/database.html (4.0 version, effective from October 1998 to June 2004); see web site of U.S. Department of Labor ("DOL"), Office of Administrative Law Judges, www.oalj.dol.gov/libdot.htm (explaining that the DOL's Dictionary of Occupational Titles ("DOT") was last updated in 1991 and then replaced by O*NET); see Corning Glass Works, 417 U.S. at 202, n.21 and accompanying text (citing Dictionary of Occupational Titles for definition of an occupational term); see also Troy v. Unum Life Ins. Co., No. 03 Civ. 9975 (CSH), 2006 WL 846355, *9 (S.D.N.Y. Mar. 31, 2006) (noting that O*NET was intended to replace the DOL's DOT).  Given the mandate to construe FLSA exemptions narrowly, and applying common sense, a reasonable factfinder could consider the presence or absence of computer-related skills in deciding whether Downes's functions placed her within the subcategories of § 213(a)(17) or better resembled those of administrators who merely survey user needs in a typical corporate workplace and shop for appropriate products.  Yet, as will be discussed, Downes's knowledge or capability alone cannot place her within the exemption; an analysis of the specific duties she actually performed is required.

22

Moreover, Downes's own testimony provides Chase with a strong argument that she falls within the § 213(a)(17) exemption.  From August 2001 until she was terminated in May 2003, she testified, she was a "technology manager and leader of the Hardware Standards Group within [Chase's] Enterprise Technology Services Group."  (Downes July 2006 Aff. ¶ 9.)  The Hardware Standards Group "was a group of engineers from different areas of the bank that selected equipment for those areas, from desktops, to servers, to peripherals, such as printers, pocket PCs, everything," and Downes was "among the group of engineers that selected equipment." (Downes Dep. 139.)  Indeed, Downes was not merely among those engineers, she was the "head" of the group.  (Id. 148.)  As such, she "led the group" (id. 149), which was responsible for "standardizing [computer] equipment for the bank" to make sure "that everybody would have the same type of equipment, so that there wouldn't be any problem with builds" (id. 141).

According to Downes, she "dr[e]w up the technical documentation" for the computer equipment and created a database regarding the specifications of the computer equipment being proposed by different vendors for Chase's use, in which Downes "would give the details of how the equipment was going to be built, the amount of memory on the desktop, the feed speed of it, the size of the hard drive, all the specs that the team members were concerned about, to make sure that their applications would work with it."  (Id. 151-52.)  Downes was heavily involved with the testing of equipment Chase was considering purchasing.  Although she was not a member of the "group that did testing of the equipment," she supervised the testing process: "the equipment would come to me, and I would make sure that they had it, and . . . I would supervise and . . . make sure that they tested it correctly, and have them report back to me the results of the test, and then I would take those tests and write about them and document them and report them

23

to the Hardware Standards Group."  (Id. 145-46.)

These functions appear to match directly with the provisions of § 213(a)(17) that exempt

computer workers whose primary duty is

> (A) the application of systems analysis techniques and procedures,
> including consulting with users, to determine hardware, software,
> or system functional specifications; [or]
> (B) the design, development, documentation, analysis, creation,
> testing, or modification of computer systems or programs,
> including prototypes, based on and related to user or system design
> specifications.

By her own testimony, Downes's core function as head of the Hardware Standards Group

involved the development, documentation, analysis, and testing of computer systems based on

user and system design specifications.  She was responsible for selecting and standardizing

hardware needs for Chase – in effect, for developing the computer systems that Chase would use.

Similarly, she, along with other members of the Group, applied "systems analysis techniques and

procedures, including consulting with users, to determine hardware . . . or system functional

specifications."  This statutory language appears to fit the activities of Downes's Hardware

Standards Group cleanly.

Downes argues now, however, that a reasonable factfinder could conclude that her

"primary duty" was not to serve as a "computer systems analyst, computer programmer, software

engineer, or other similarly skilled worker."  She emphasizes evidence that she functioned not as

a computer professional, but rather as an administrative or professional employee of the sort

covered by the EPA under § 213(a)(1).

As already noted, the legal premise of Downes's argument is faulty.  The structure of the

exemptions from the FLSA does not permit the conclusion that anyone who can be considered an

24

"executive, administrative, or professional" worker is covered by the EPA regardless of falling within any other exemption category.  Rather, the 1972 amendment to the EPA simply provides that falling within that category, which exempts one from coverage of the minimum wage and maximum hours provisions of the FLSA, does not in itself exempt one from coverage by the EPA.  See supra, note 4.  That leaves entirely open the possibility that one could be encompassed within some *other* FLSA exemption, such as § 213(a)(17).

Downes notes, however, that the intensely fact-specific primary duty standard contemplates that an employee may have mixed functions, including (for example, as arguably relevant here) technical computer work, administrative organizational tasks, and routine purchasing-agent-type responsibilities.  In assessing an employee's classification under the FLSA and EPA a factfinder must parse the employee's different functions, and decide which among them is her "primary duty."  See 29 C.F.R. § 541.103 (2003).

On this record, a reasonable factfinder could conclude that Downes's primary duty was not to perform any of the specialized computer-related functions described at § 213(a)(17), but rather to be a purchasing manager and an in-house administrative coordinator in the vein of countless corporate workers in innumerable fields.  The words "computer" and "technology" cannot be treated as incantations automatically conjuring statutory exemption, when an employee's work principally involved non-exempt tasks.  As noted above, much of Downes's work could be found by a reasonable factfinder to be highly technical, systems analysis work.  Albeit performed in coordination with others as part of a team, one duty Downes had, indeed as leader of that group, was deciding how Chase's computer systems could be coordinated and determining, on the basis of technical criteria, what hardware was appropriately made part of

25

those systems.  Other aspects of her duties, however, involved meeting with computer-equipment vendors to solicit and negotiate product offers and pricing and communicating with Chase managers about the equipment they needed or their vendor preferences.  (Downes Dep. at 148-49, 160.)  While this work no doubt required some technical expertise – buying computers is presumably a more sophisticated task, and requires a different type of technical knowledge, than buying routine office supplies – the task of negotiating with vendors and getting the best price for equipment that has already been determined (by oneself or by other, more expert technology engineers) to be appropriate is a task comparable to that of any number of purchasing agents, and is not "the application of systems analysis techniques . . . to determine hardware . . . specifications," § 213(a)(17)(A), or any other task defined in §213(a)(17).

There is additional ambiguity, moreover, in the description of Downes's tasks as head of the Hardware Standards Group.  That the work consisted largely of organizing and conducting meetings does not in itself take that work out of the § 213(a)(17) exemption.  Systems analysis is specifically defined by the statute to "includ[e] consulting with users," §212(a)(17)(A), and a systems analyst as so defined would surely spend a great deal of time meeting with operational employees in an effort to learn their needs and design systems to accommodate them, and with other engineers and analysts to coordinate their information and reach conclusions about the necessary specifications for the systems to be designed and the hardware to be acquired.

But the role of a coordinator or facilitator is a complex one, and it is hardly inconceivable that a company could assign a manager who was not especially involved in technological matters, but was a skilled facilitator and coordinator of the work of others, to supervise such a group.  Such a manager would spend a great deal of time on non-exempt duties such as preparing

26

for, leading, and following up on internal meetings; meeting and negotiating with vendors; directing others to test products for potential purchase; creating a database to organize and disseminate product-related information for potential purchase; acting as a liaison between vendors and engineers; and providing layout ideas and content for a web page.  These are functions that Downes apparently performed.  (Downes July 2006 Aff. ¶ 4; Downes Dep. at 143, 145-46, 148-49, 151-52, 156-57.)

Depending on the precise testimony presented to a factfinder about the level of technological expertise required for such tasks in the specific context of Downes's particular working group, the amount of time devoted to each task, and the extent to which Downes functioned in the group as an analyst of technical needs or as a coordinator of the efforts of others, a factfinder might reasonably conclude either that she functioned primarily as an analyst of computer systems (who as the chief of the group devoted some amount of time to purely administrative tasks), or primarily as an administrative officer who spent most of her time coordinating meetings (at which the actual technical analysis pooled their expertise) and then executing the purchases decided upon by the analysts.[11]  That specialized technical knowledge

---

[11] Some of the contemporaneous evidence stresses Downes's ability, and elaborates on her efforts, as an administrative leader, rather than as a technician.  Upon the announcement in April 2003 of her impending departure, one colleague wrote an email addressed to Chase employees other than Downes stating that, "[u]nder Sue's stewardship this [Hardware Standards Group] has been one of the most organized and productive working groups I attend, and is a shining example of a functioning COE.  Having attended this meeting for a number of years now, I can still recall when this was not the case."  (Downes July 2006 Aff., Ex. 2, email of John Woodmansee.)  Another e-mailed a large group to urge the continuation of the meetings Downes had helmed, and still another wrote to a number of addressees that "Sue Downes has been excellent at directing this forum."  (Id., emails of Aaron Albert and Robert Stabile.)  A member apparently of the equipment-testing lab e-mailed several Chase individuals, stating that "the lab has relied on Sue Downes to assist in managing and prioritizing our projects.  She has been an invaluable resource to the lab, acting as a liaison between vendors and clients globally. . . . [H]er

may have helped or been necessary to Downes in coordinating dissemination of such products on

the scale of a large company or otherwise performing a primary duty does not, by itself, slot her

within § 213(a)(17); that provision does not premise exemption on a complainant's mere

knowledge or capability.[12]

Defendants have thus failed to establish the absence of any genuine issue of material fact

regarding plaintiff's exemption from EPA coverage.  Neither have they established – anymore

than on their first summary judgment motion, when they were rejected on this front by Judge

_____

contacts, technical and communications skills ha[ve] enabled us to resolve support issues and
certify hardware in a timely manner."  (Id., email of Lisa Wu.)
        It is for the factfinder to determine if defendants can show that Downes used advanced
*computer technology* skills – as opposed to administrative, marketing, or communications skills
– to coordinate the selection and acquisition of hardware, or simply served as an administrative
coordinator.  The present record is too conclusory for the Court to hold as a matter of law that
Downes's involvement in selecting hardware such as servers qualifies as systems analysis, since
it does not specify the extent of her analysis in recommending such selections.  Similarly, the
record fails to specify what Downes's "standardizing" of equipment throughout the company
entailed.  (Downes Dep. at 141:5.)  That duty could principally challenge skills of organizational
administration, but it might also depend heavily on specialized computer-related skill.  Finally,
Downes has attested that her responsibilities included ensuring that the equipment-testing group
would test a piece of equipment "correctly."  (Id. at 146:5.)  Here again, the record does not
explain what skills were applied to assess the equipment-testing competency of others, and to the
extent defendants can show these skills are described in § 213(a)(17), this duty of Downes's may
or may not qualify as exempt work.

[12] Defendants' citation to another case decided in this district, Bobadilla, 2005 WL
2044938, does not change this analysis.  Contrary to defendants' representation, the Bobadilla
Court did not hold plaintiff exempt based on his "requisite knowledge and understanding" of the
work of others.  (See D. Response to P. Supp Mem. at 5, n.4.)  Rather, that court concluded that
the plaintiff had "made actual, analytical decisions about how [defendant's] computer network
should function[,] . . . . assisted in the design and implementation of the . . . network [and,] [i]n
addition to installing and upgrading hardware and software, checking cables, and
troubleshooting user connectivity problems, . . . consistently made decisions regarding network
modification and design, exempted responsibilities under Section 213(a)(17)."  Bobadilla, 2005
WL 2044938 at *8.  Moreover, even if that court had concluded otherwise, the result of the case-
specific exemption inquiry could reasonably differ in the instant matter.

Dolinger and this Court – that the male workers Downes seeks to compare are indisputably incomparable.  Just as it is far from settled whether Downes should be exempted under § 213(a)(17), the Court cannot conclude as a matter of law that, as contended by Chase, the "male comparators undoubtedly performed the type of skilled computer work described and exempted" by that provision.  (D. Response to P. Supp. Mem. at 20.)

Unquestionably, in order to prevail at trial, Downes must walk a thin and somewhat wavering line.  On the one hand, in order to escape the § 213(a)(17) exemption from the EPA, she must convince a jury that her primary work was not the sort of highly technical, skilled computer analysis to which the requirement of equal pay does not apply – and she must do so in the face of considerable evidence, much of it from her own testimony, suggesting that she was a proficient computer analyst responsible for designing and implementing the hardware specifications necessary to serve Chase's computer needs.  On the other, in order to establish that she was underpaid as compared to similarly-situated male employees, she must at the same time convince the jury that her work was comparable to that of specific male employees whose work, at least on superficial analysis, would appear to consist precisely of the sort of technical computer work that Downes now says she did not do.  It may be doubtful whether Downes can simultaneously succeed in both of these tasks.  However, both present issues of fact that must be resolved at trial if the parties cannot at long last settle their dispute.

## CONCLUSION

As defendants have failed to establish the absence of any genuine issue of material fact regarding plaintiff's exemption from EPA coverage, their motion for summary judgment is denied.

29

SO ORDERED.

Dated: New York, New York
     May 16, 2007

GERARD E. LYNCH
United States District Judge

30